# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARVIA ROBINSON,**

**Plaintiff,**

-vs-                                                    **Case No.  6:05-cv-717-Orl-31DAB**

**ORANGE COUNTY, FLORIDA,**

**Defendant.**

_____

# ORDER

The Plaintiff, Marvia Robinson ("Robinson"), sued Orange County, Florida (the

"County"), alleging age discrimination in violation of the Age Discrimination in Employment Act,

29 U.S.C. section 621, et seq. (the "ADEA").  This matter is presently before the Court on the

County's Motion for Summary Judgment and Memorandum in support thereof (Docs. 31 and 32),

and Robinson's Response in opposition thereto (Doc. 36).

## I.      Background

A. Facts

*1) Robinson's history with Orange County Corrections*

Robinson was originally hired by Orange County Corrections ("OCC") in December of

2002 for the position of correction release specialist, at which time she was 45 years old.  (Doc. 28

at 44-45).  As part of the hiring process for that position, she was interviewed by a three-member

panel.[1]  (*Id*. at 46).  After being hired, she was given an employee manual, access to personnel

_____

[1] Robinson does not believe that any of the persons who interviewed her or hired her
discriminated against her because of her age.  (Doc. 28 at 47).

policies and procedures, and a Corrections code of ethics, in which OCC identifies itself as an equal opportunity employer and prohibits age discrimination.  (*Id*. at 47-48).

Prior to applying for promotion to her current position, Robinson applied for promotion a number of times.  (Doc. 28 at 50).  She first applied for the position of unit supervisor, for which she took a written test and participated in an interview.[2]  (*Id*. at 51-52).  She was not selected for the unit supervisor position, but does not believe that she was not selected because of her age.  (*Id*. at 52).  She next applied for the classification officer position, for which she took and passed a written test and participated in an interview.  (*Id*. at 54).  She was not selected for the classification officer position, but she does not believe that her age played a part in the decision.  (*Id*. at 54-55).  She subsequently applied again for a classification officer position, but she failed part of the test, which made her ineligible for the promotion.  (*Id*. at 56).  Nevertheless, she believes her age played a part in making her ineligible for that promotion because she was advised the she would not receive an interview prior to the release of the test results.[3]  (*Id*. at 56-57, 63).

She then applied for a corrections officer position in July of 2004, out of which this case arose.[4]  (Doc. 28 at 73).  At the time she made her application, there were approximately fifty

---

[2] She passed the written test.  (Doc. 28 at 52).

[3] Robinson has not made a claim regarding that particular promotion.

[4] After applying for the corrections officer position, she applied for a lieutenant position, for which she was not accepted based on certain assessment scores.  (Doc. 28 at 73-75).  She did not challenge that finding, however, because she had begun challenging the OCC's refusal to promote her to corrections officer.  (*Id*. at 75-76).  Nevertheless, she does not have any facts upon which she could rely to demonstrate that age played a role in the determination that she was not eligible for the lieutenant position.  (*Id*. at 76-77).

vacancies.[5]  (*Id*. at 83-84).  Those slots were being filled both by promoting individuals from

within OCC and by hiring individuals from outside OCC.[6]  (*Id*. at 85).

   *2) The beginning of Robinson's application for the corrections officer position;
   testing and scoring*

   The first part of the application process involved a "pre-employment screening," which

determines whether an applicant meets the minimum qualifications for the position.[7]  (Doc. 28 at

103).  Robinson successfully completed that part of the application process.  (*Id*.).  She then took a

"scenario-based video exam," which consisted of asking the applicant for his or her reactions to

various scenarios involving the duties of a corrections officer.[8]  (Doc. 28 at 92, 104).  The

applicant would watch a video and answer questions by recording their answers on paper.  (*Id*. at

105).  To record an answer, the applicant would "fill in a bubble" corresponding to the answer.

(*Id*.).  Prior to taking the exam, she was instructed to fill in the bubbles completely and to

completely erase an answer if she made a mistake.  (*Id*. at 106-107).

   Completed exams were sent to Ergometrics, Inc. for scoring.  (Doc. 28 at 107; Doc. 32,

Att. 1 at 1).[9]  Ergometrics uses an automated procedure to grade the examinations, and then

_____

   [5] Robinson does not know how many people were ultimately selected.  (Doc. 28 at 84).

   [6] OCC gives its employees the chance to apply first, before making the vacancies available
outside of OCC.  (Doc. 28 at 91).

   [7] The application process involves a number of steps, each of which an applicant must pass
before moving on to the next step(s): first, an initial application; second, a test; third, an interview;
and fourth, a background check, which includes a polygraph, psychological examination, physical
exam and drug test.  (Doc. 30, Att. 3 at 10-12; Doc. 32, Att. 1 at 1-2).

   [8] The exam was created by Ergometrics, Inc., one of Orange County's vendors.  (Doc. 32, Att.
1 at 1).

   [9] Robinson, however, doubts that her exam was sent out because there was a change in the
information she received regarding whether she had passed the exam (*see* discussion, *infra*).  (Doc.
28 at 106).

generates a report indicating the score each applicant received.  (Doc. 32, Att. 1 at 1; Doc. 29, Att. 7).

After taking the test, Robinson called Suzanne Lin, an HR Analyst at OCC ("Lin"), who reviewed the Ergometrics report which indicated that Robinson had failed, and told Robinson that she had failed.[10]  (Doc. 28 at 92; Doc. 32, Att. 1 at 1).  Robinson was "shocked" and "felt insulted" to learn that she failed because of her knowledge, so she contacted Deputy Chief Riley ("Riley") by email on July 19, 2004, informing her of the situation.[11]  (Doc. 28 at 93, 110-11).  Riley responded that same day, stating that she would look into the matter.  (*Id*. at 93, 111; *see also* Doc. 29, Att. 4 at 5).  Lin subsequently sent an email to Ergometrics questioning the validity of Robinson's score, and was told that the results could have been the result of a scoring error caused by Robinson failing to fill in answer bubbles, completely erase incorrect answers, or other similar reasons.[12]  (Doc. 32, Att. 1 at 2; Doc. 29, Att. 8, Att. 10).  Lin requested that Ergometrics score

---

[10] During her conversation with Lin, there was no reference made to Robinson's age.  (Doc. 28 at 110).

[11] In the email, Robinson advised Riley of her application for the corrections officer position, that she was surprised to find out that she had failed the test, and that she had been told that she would have to wait six months to reapply.  (Doc. 29, Att. 4 at 5).  She then requested that Riley have someone check to see if she had actually failed the test.  (*Id*.).

[12] Robinson believes that an email between Lin and Ergometrics was falsely generated because at the time Lin spoke with her about the test, Lin did not express any doubts about the results, because Lin did not tell her that she (Lin) had contacted the company to find out if the test results were correct, and because when she met with Lin and Witcher (*see* discussion, *infra*), they did not tell her that they had corresponded via email with Ergometrics and did not tell her that the testing company had made a scoring error.  (Doc. 28 at 115-16, 119-20).  Robinson also believes that it is not possible that she did not correctly fill in the bubbles on her answer sheet because she has "taken several tests prior to this; from high school [she's] been using bubbles and [she] knows exactly how to fill bubbles in and how to make sure it is dark enough for them to read it," and because she would not have chosen two answers and would have filled in the bubbles with a dark shade.  (*Id*. at 117-18, 121).  She does not, however, believe that anyone at Ergometrics would make something like that up to prevent her from being promoted because of her age.  (*Id*. at 118).

Robinson's test by hand, which Ergometrics did, and determined that Robinson had passed the

test. (Doc. 32, Att. 1 at 2). The following day, Robinson received an email from Lin stating that

she (Lin) had made a mistake. (Doc. 28 at 92). Lin subsequently called Robinson and told her that

she (Lin) made a "big mistake" and that Robinson had indeed passed the test and that there was a

slot on the interview schedule available for Robinson.[13] (*Id*. at 92, 111-12).

　　　Robinson believes that she was falsely told that she had failed the test so that she would not

have to be considered for the position because of her age. (Doc. 28 at 125). She considers being

told that she did not pass the test to have been age discrimination because she

> know[s] within [her]self that [she] did pass the test. And when Ms. Lin informed
> [her] that [she] did not past (sic) the test, then that was something that triggered
> something in [her] body saying there's something more to it than just [her] not
> getting the position.

(Doc. 28 at 126). Even if a mistake was made, she still considers it to have been age

discrimination because

> [f]or someone in that position and information you pass on to an applicant or to
> anyone else, you would make sure it is correct before you pass that information on.
> Passing information like that on to . . . applicants that might have happened to in
> the past caused someone to want to change their whole career, lifestyle, future. So
> if she's in a position like that where she's passing on this type of information, she's
> supposed to make sure that the information is correct.

(Doc. 28 at 126-27). Therefore, Robinson considers Lin's actions to have been a lie, which she

believes is indicative of age discrimination. (*Id*. at 175-76). She acknowledges, however, that Lin

"did not outright say because of [her] age," but simply dismisses that fact because "no one would

come out bluntly and say, I am doing this because of age." (*Id*. at 175-76).

---

[13] Robinson believes that Lin's original statement that she had failed the test was a lie because she (Robinson) and Lin both "knew" that Robinson had passed the test and because if Lin had any doubts she would have mentioned those doubts up front and told Robinson that she (Lin) had contacted the testing company. (Doc. 28 at 167-68).

Once her test had been checked and it was determined that she had passed, Robinson was able to sit for an interview.  (Doc. 28 at 130).  The incorrect scoring of her test did not delay her ability to sit for an interview.  (*Id*.; *see also* Doc. 30, Att. 3 at 16).

*3) Robinson's interview*

At the interview, Robinson entered the interview room and offered to shake hands with the members of the panel,[14] but no one responded.[15]  (Doc. 28 at 95).  Robinson answered the questions posed to her,[16] and when she was asked if there was anything else, she stated that she suggested that she be placed in an area where someone with her experience would be suitable, such as at a booking facility.  (Doc. 28 at 95).  Lichtenwald responded that there were areas available such as the Genesis building.  (*Id*.).  During the interview, Robinson felt uneasy because Pinella did not shake her hand, felt that Hennessy was "very cold" toward her, and that

---

[14] The members of the interview panel were Lieutenant Hennessy ("Hennessy"), Sergeant Lichtenwald ("Lichtenwald") and Sergeant Penilla ("Penilla").  (Doc. 28 at 132-33).  Each member of the interview panel underwent human resources training prior to participating on an interview panel.  (Doc. 32, Att. 2 at 2).  Robinson does not know any of their ages, but believes that Penilla is younger than her, based on his appearance.  (Doc. 28 at 134).

[15] Robinson states that

[f]rom their action I felt like I was singled out because, number one, I did go to the chief and the deputy chief.  And I felt that they already knew everything about Marvia Robinson to fail me for the test. And because of that, the results they all came up with the same thirteen points by juggling the different answers. . . . I felt they were angry about it or they were following orders to just go along with the interview . . . maybe it was a plant interview. They just went through with it because the chief and the deputy chief had gotten involved.

(Doc. 28 at 135).

[16] The questions she was asked were questions written on forms, and Robinson believes that all of the questions were legitimate questions for an interviewer to ask of a applicant seeking the type of promotion she sought.  (Doc. 28 at 140-46). The panel members did not exhibit a demeaning attitude while they asked the questions.  (*Id*. at 147).

Lichtenwald was unprofessional, leaving her with the feeling that she was going to fail and that she had no hope of being promoted.  (Doc. 29, Att. 1 at 11).  She did not get the impression that Penilla harbored any animus toward her based on her age.  (Doc. 28 at 139).  Hennessy did not say anything indicating that she had any animus toward older workers, but from her refusal to shake hands, Robinson felt that Hennessy was aware that she (Robinson) had challenged the results of her test and that Hennessy was angry about it.[17]  (*Id*. at 134-35).

Robinson believes that Lichtenwald harbored animus toward her on account of her age because when she mentioned that her experience warranted assigning her to an area such as central booking, Lichtenwald stated that they had other needs such as the Genesis area.  (*Id*. at 136-37).  Although Robinson does not believe that Genesis is a less attractive position or less prestigious, she found Lichtenwald's comment demeaning because she felt he was essentially telling her that she was nothing special and that she would be placed wherever they assigned her.  (*Id*. at 137-38).  She believes that this demeaning comment was based on Lichtenwald's desire not to compete with her because she might have been a better and more experienced employee than him, and that experience comes with age, so that his comment was motivated, in large part, by age discrimination.  (*Id*. at 138-39).

Panel members rate an applicant's answer on a scale of one to five.[18]  In order to move forward with the application process, an applicant has to pass the interview.  (Doc. 30, Att. 3 at

---

[17] Robinson also believes that the members of the panel were angry about her challenge to her test scores because they told her that she would be notified of the results of the interview in ten days, whereas other applicants told her that they had found out at the interview.  (Doc. 28 at 135-36).

[18] Robinson has participated in interviewing applicants.  She believes that it is fair to have three members on a panel, and she believes that it is expected for there to be different ratings of applicants among the panel members.  (Doc. 28 at 158-59).  She acknowledges that applicants must be compared and that the best applicant, or the one with the highest number, should be selected.  (*Id*. at 159).

18).  Only those applicants that score higher than 18 on the interview proceed on to the next

phase.[19]  (*Id*. at 18-19).[20]  Interview scores are obtained by the interview panelists, who take notes

during the interview, score the applicant themselves, and then, at the end of the interview, discuss

the merits of the answers and come up with a consensus score.  (*Id*. at 24-25; Att. 1 at 12).  The

consensus score is the score upon which it is determined whether an applicant passes the

interview.  (Doc. 30, Att. 3 at 24).  After the interviews, eight applicants under the age of thirty-

four and four applicants over the age of thirty-four were selected to continue the application

process.  (*Id*. at 25-26; Doc. 32, Att. 9).

Two days after the interview, Robinson received a letter from the human resources

department stating that she had been rejected.[21]  (*Id*.; see also Doc. 29, Att. 4 at 6).  Robinson

believes that she "failed" the interview because she was not graded fairly.[22]  (Doc. 28 at 173).

Each member of the panel, however, has provided their rationale for the manner in which they

scored Robinson's interview, stating that Robinson: (1) failed to demonstrate adequate knowledge

---

[19] The number 18 as a score is the standard at OCC.  (Doc. 30, Att. 3 at 20).  Lin does not know where that number originated, and has not seen it written in any manuals or policies.  (*Id*. at 21).  Instead, she was simply told that it was the required score.  (*Id*.).

[20] Robinson believes that "there is no failing score that a applicant can receive for an interview."  (Doc. 28 at 169).

[21] Robinson did not receive a score of 18 on the interview.  (Doc. 30, Att. 1 at 21; Doc. 32, Att. 1 at 2).

[22] Robinson believes that the interview process, as applied to her, was not fair because the members of her interview panel had "preplan[ned] their scoring points."  (Doc. 28 at 160).  She bases that belief on the fact that each panel member's scores stayed below fifteen points, which is the number that Robinson was told was the "passing point."  (*Id*.).  She reasons that "if they know they had someone which they had all intentions of failing, they already made sure their points stayed below that. And that's why the points are basically juggled. . . . They keep their points with all three scores below fifteen."  (*Id*.).

of policies and procedures; (2) had difficulties with a supervisor and the manner in which she

handled the situation indicated that she had difficulty working well with others; (3) had received

formal discipline related to an attendance issue, which indicated that Robinson had failed to

correct the problem on her own; (4) gave vague and incomplete answers; (5) did not reflect the

level of enthusiasm expected for a corrections officer; (6) was unable to identify and differentiate

different types of emergencies and how they should be handled; and (7) gave an answer that was

not relevant.  (Doc. 32, Att. 3 at 1-2; Att. 4 at 1; Att. 5 at 1-2).  Each member of the panel

specifically stated that Robinson's age had nothing to do with their assessment of her.  (Doc. 32,

Att. 3 at 3; Att. 4 at 2; Att. 5 at 2).

   *4) Subsequent events*

   On August 5, 2004, Robinson sent an email to Chief Ryan ("Ryan") informing him of her

situation.  (Doc. 28 at 96; Doc. 29, Att. 4 at 7).  Ryan responded the next day stating that he

understood her frustration and that he had asked Eric Witcher, the Manager of Human Relations

and Fiscal Services ("Witcher"), to review her concerns.[23]  (Doc. 28 at 96; Doc. 29, Att. 4 at 7;

Doc. 30, Att. 1 at 4).  Several days later, Witcher contacted Robinson and asked to arrange a

meeting.[24]  (Doc. 28 at 96).  Robinson subsequently met with Witcher and Lin, and they went over

the questions and answers from the interview.  (*Id*.).  Witcher discussed the issues, the scoring

mistake, the interview process, and why Robinson had not been selected to continue the process.

---

   [23] Robinson believes that Ryan's response within one day was prompt, and that it was appropriate for Ryan to refer the matter to Witcher because of Witcher's position.  (Doc. 28 at 176). She does not believe that Ryan's decision to refer the matter to Witcher had anything to do with her age.  (*Id*. at 177).

   [24] Four days passed before Witcher responded, and in doing so, he expressed a willingness to meet with Robinson and to discuss the matter with her.  (Doc. 28 at 177-78).  Robinson believes that this was an appropriate response time.  (*Id*.).

(Doc. 30, Att. 1 at 10).  Witcher told her that she had not been selected to move forward because she had not been recommended by a consensus vote from the interview panel.  (*Id*. at 11).

During that meeting, Robinson found Witcher to be very respectful.  (Doc. 28 at 179).  However, she believes that Lin gave her angry looks.  (*Id*.).  Nevertheless, neither Witcher nor Lin appeared to be predisposed to the matter in any way.  (*Id*.).  During the meeting, Robinson told Witcher that she believed she was the victim of age discrimination, to which Witcher responded that he did not think so, but that he would check into it.  (*Id*. at 181).  Robinson found this response to be neither negative nor positive.  (*Id*.).  At one point, Witcher indicated that he could not answer certain of Robinson's questions, so she thanked him for his time.  (*Id*. at 179-80).

Robinson believes that she has been discriminated against because of her age because, as she asserts, "everyone that was hired in the correction officer position [was] much younger than" she was.  (Doc. 28 at 128).  She attempted to match a list of hirees with a personnel list that included birth dates, and was able to match some of those people and thus determine their birth dates.  (Doc. 28 at 85-86).  She was able to point to several individuals under the age of forty.  (*Id*. at 89-90).  She admits, however, that she does not know the ages of a number of people on the list of hirees.  (*Id*. at 88-91).  Instead, she insists that "just based on seeing them working in the area, [she] know[s] they're young."  (*Id*. at 90).

Robinson currently works at OCC as a docket supervisor, having been promoted to that position in May of 2005.[25]  (Doc. 28 at 24).  Prior to her promotion, she worked as a correction

---

[25] Along with that promotion, Robinson received a corresponding increase in pay.  (Doc. 28 at 24-25).  Had Robinson received the corrections officer position, she would have started out at the highest pay level available for that position because of her years of experience.  (*Id*. at 35).  She believes that Lin demonstrated age-based animus when Lin informed her of that because when Robinson asked about the pay, Lin asked about her experience and, upon learning of Robinson's experience, stated that it meant that OCC would have to pay her the "top salary."  (Doc. 28 at 127).  Robinson believes that statement demonstrates that Lin was thinking that she was an older person, and that while economics may have played a role, that age was the major factor.  (*Id*. at 127-28).

release specialist.[26]  (*Id*.).  The promotion process involved a written examination and a panel interview, in which she was asked the same questions asked of every applicant.  (*Id*. at 26-28).  At the time she went through that interview process, she did not believe that she was discriminated against because of her age.  (*Id*. at 28).  Since she was promoted to docket supervisor, there have been vacancies for corrections officer positions, but she has not applied for them because she is currently eligible for, and applying for, a lieutenant position, which is a more advanced position than that of corrections officer.  (*Id*. at 36-37).

B. Claims and Arguments

Robinson has filed a claim alleging a failure to promote in violation of the ADEA.  The County has moved for summary judgment, arguing that Robinson has failed to state a *prima facie* case of discrimination under the ADEA and, even if she has stated a *prima facie* case, OCC has offered legitimate reasons for its decision which Robinson has failed to rebut.

## II.      Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving

---

[26] Robinson was able to work overtime in both positions, but had the opportunity to work more overtime hours as a correction release specialist.  (Doc. 28 at 26).

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[27]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

**III.    Legal Analysis**

A. Age Discrimination and the Burden-Shifting Analysis

The ADEA makes it unlawful for an employer to fail or refuse to hire, to discharge, or to otherwise discriminate against any individual with respect to compensation, or the terms,

---

[27] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

conditions or privileges of that individual's employment because of that individual's age.  *Reeves*

*v. Sandserson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (*citing* 29 U.S.C. § 623(a)(1)).

　　　　To prove a claim of age discrimination, "a plaintiff can establish a *prima facie* case of

discrimination through either direct evidence of discrimination or a variation of the four-part test

outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for circumstantial

evidence."  *Damon v. Fleming Supermarkets Of Fla., Inc.***,** 196 F.3d 1354, 1358 (11th Cir. 1999);

*Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).  Because Robinson has conceded

that she relies solely on circumstantial evidence, (*see* Doc. 36 at 1), the Court will employ a

burden-shifting scheme, as follows: (1) initially, Robinson must establish a *prima facie* case of

discrimination; (2) OCC must then respond with a legitimate, nondiscriminatory reason for its

actions; and (3) to prevail, Robinson must establish that OCC's articulated reason was merely a

pretext to mask unlawful discrimination.[28]  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d

1428, 1432 (11th Cir. 1998).

　　　　To satisfy the initial *prima facie* requirement of an age discrimination case based on

circumstantial evidence, a plaintiff must establish:

> (1) that [he] was a member of the protected group of persons between the ages of
> forty and seventy; (2) that [he] was subject to adverse employment action; (3) that a
> substantially younger person filled the position that [he] sought . . . ; and (4) that
> [he] was qualified to do the job for which [he] was rejected.

*Damon*, 196 F.3d at 1359.  An "adverse employment action" is any ultimate employment decision,

such as a discharge "or other conduct that alters the employee's compensation, terms, conditions,

or privileges of employment, deprives him or her of employment opportunities, or adversely

---

[28] The "ultimate burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.

affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th

Cir. 2000). The term "adverse employment action" thus includes not only discharges and

reprimands, but also refusals to hire or promote. *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th

Cir. 1994).

Once the plaintiff establishes a *prima facie* case, a presumption of discrimination is

created. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *Tidwell v. Carter

Prods.*, 135 F.3d 1422, 1426 (11th Cir. 1998). The burden of production then shifts to the

defendant to rebut the presumption of discrimination by producing at least one legitimate non-

discriminatory reason for the adverse employment action. *Sullivan v. Nat'l R.R. Passenger Corp.*,

170 F.3d 1056, 1059 (11th Cir. 1999); *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th

Cir. 1998). The defendant does not have to persuade the court that it was actually motivated by

those reasons. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Instead, the

defendant must only offer sufficient evidence to create a genuine issue of fact as to whether it

discriminated against the plaintiff, and may do so by introducing evidence demonstrating the

reasons for the action taken against the plaintiff. *Id*. at 255; *see also Reeves v. Sanderson

Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (noting that this burden "is one of production, not

persuasion"). The defendant's explanation in this regard must be "legally sufficient to justify a

judgment for the defendant."[29] *Burdine*, 450 U.S. at 254.

If the defendant offers legitimate reasons, the presumption of discrimination disappears,

and the plaintiff must then show that the employer's proffered reasons for taking the adverse

---

[29] At the same time, however, the defendant's burden is only one of production, not of proof,
and this burden is "exceedingly light." *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142
(11th Cir. 1983).

action were merely pretextual.  *Sullivan*, 170 F.3d at 1059; *Tidwell*, 135 F.3d at 1426.  The

plaintiff may do so either by "persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence."  *Burdine*, 450 U.S. at 256.  Summary judgment in favor of the employer is

proper where the plaintiff fails to satisfy the burden of establishing that the employer's reasons

were pretextual.[30]  *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004).

　　B. Robinson's Claim

　　The Court presumes that Robinson has stated a *prima facie* case of age discrimination, in

that she has established that: (1) she is a member of a protected group because she was over forty

years of age at the time the relevant events occurred; (2) she suffered an adverse employment

action when she was not promoted to the corrections officer position; (3) individuals outside of her

protected class - younger individuals - were promoted to that position; and (4) she was qualified

for the corrections officer position.[31]

---

　　[30] Whether judgment as a matter of law is appropriate depends on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Reeves*, 530 U.S. at 148-49.

　　[31] The County argues that Robinson was not qualified because she could not pass the interview process.  This argument would essentially prevent any employee from bringing a discrimination claim where that claim arises out of process-based discrimination, particularly in a case such as this where the nature of the claim is essentially that discrimination at one phase of the qualification procedure prevented the claimant from becoming qualified and thereby prevented a promotion.  Were the Court to accept OCC's argument, any employer could discriminate in any phase of the decision-making process that determines an employee's qualifications (thereby resulting in the employee being found to be "unqualified"), and then mask that discrimination by simply claiming that the employee was not qualified.  In any event, in age discrimination cases, the Court is to examine the plaintiff's skills and background to determine whether the plaintiff was qualified for the position in question.  *Damon*, 196 F.3d at 1360.  For the purposes of this analysis, the Court presumes that, based on Robinson's experience as a corrections officer prior to working for OCC, (*see* Doc. 28 at 14-16), she was qualified for the corrections officer position at OCC.

Robinson's primary point of contention is OCC's failure to promote her to the corrections officer position, and the County has offered legitimate, non-discriminatory reasons for its actions, demonstrating that the reason she was not promoted was because she did not achieve a high enough score on her interview.  Further, the County has offered the statements of the members of Robinson's interview panel, each of whom provided concerns regarding her ability to answer questions, whether she had the appropriate personality for the position, and whether she had the necessary knowledge to be able to function properly as a corrections officer.  In addition, each member of the panel specifically denied that Robinson's age had anything to do with their evaluation of her.

Robinson addresses this issue by engaging in almost four pages of analysis of the manner in which the interview panel scored various applicants.  (*See* Doc. 36 at 5-8).  She compares the scores given to different applicants and challenges the conclusions at which the panel members arrived.  For example, addressing one applicant outside of Robinson's protected class, she asserts that

> an incredible amount of explanation is needed as to how the Plaintiff, with all of her experience flunked the interview while the youngest hire who also had the highest score . . . whose only experience was a civilian technician, had no Corrections officer experience, and in fact, applied to be a "Corrections Officer Trainee."

(Doc. 36 at 6).[32]  She also compares her scores on experience and communication skills with another applicant (who received higher scores with apparently less experience), and questions the reasoning for those scores.  Robinson concludes that

---

[32] For some reason, Robinson also found it necessary to criticize this individual's resume and job objectives.

> one must question the rationality and credibility of the interview panel where an
> individual like the Plaintiff with vast experience in corrections receives minimal
> scores for demonstrated skills, training and/or experience while those with little or
> no experience received high scores.

(Doc. 36 at 7).  This is precisely the type of arguments that courts have refused, time and again, to

entertain, because anti-discrimination legislation does not exist to require federal courts to act as

personnel departments questioning the business judgment of employers.  *See Davis v. Town of*

*Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001); *Lee v. GTE, Fla., Inc.*, 226 F.3d 1249,

1254 (11th Cir. 2000) (court's "role is to prevent unlawful hiring practices, not to act as a 'super

personnel department' that second-guesses employers' business judgments") (internal citation and

quotation omitted); *Damon*, 196 F.3d at 1361 ("We are not in the business of adjudging whether

employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful

discriminatory animus motivates a challenged employment decision.").  A "plaintiff may not

establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the

employer's reason, at least not where, as here, the reason is one that might motivate a reasonable

employer."[33]  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

　　　Robinson's only attempt to demonstrate that there was age-related bias in the interview

itself relates to Lichtenwald's comment that they had needs in an area other than that area in which

Robinson expressed interest.  Robinson asserts, without factual support, that Lichtenwald made

---

[33] Certainly, there could be any number of legitimate reasons for the scoring differentials, not
the least of which are those offered by the members of the interview panel.  It is not the Court's place
to question the wisdom of the panel members who scored an applicant with less experience higher
than an applicant with more experience.  The Court was not present at the interviews, and there could
have been a variety of factors contributing to the scores ultimately assigned to the applicants.  The
County has offered legitimate reasons for the scores assigned to Robinson, which she simply cannot
overcome merely by challenging the wisdom, rationality and, ultimately, the business judgment of the
panel.

that comment because he found her to be a more experienced employee and that he was worried about competing with her.  From that, Robinson concludes, by negotiating a frayed and wobbly logical tightrope, that Lichtenwald's comments exhibit age-related animus because Lichtenwald's comments were motivated by her experience and, according to Robinson, experience comes with age.  Such groundless conjecture fails to even approach the realm of evidence sufficient to rebut a legitimate non-discriminatory reason for employment action.  Robinson's other challenges to the interview process are even less substantial.  Not only does she admit that nothing the other two panel members did or said indicated any animus toward older workers, but she states that her concerns regarding the manner in which they acted toward her were based on her belief that they were angry with her for complaining about her test scores.  Finally, her conspiracy theory claim that the members of the panel pre-planned their scores and colluded to give her an artificially low score specifically to prevent her from advancing not only lacks any factual support, but is never connected, in any way, with her age.

Robinson's second point of contention is that she was discriminated against when she was told that she failed the test.  The County has also rebutted this claim, demonstrating that her test was scored by an outside agency, which reported that Robinson had incorrectly filled out the test form.  Further, OCC took steps to ensure that Robinson's test was properly scored, at which point it was determined that she had passed.  Thus she was able to proceed, without delay, to the next step of the application process.  At no point does Robinson offer any evidence that her age ever arose as a factor in this process, and even acknowledges that during her initial conversation with Lin, no reference was made to Robinson's age.

If Robinson's assertions regarding the interview process were tenuous at best, her claims relating to the scoring of her test border on the fantastic: she casts groundless aspersions at Lin, asserting that Lin lied to her; she refuses to accept the possibility that she incorrectly filled out her test form; and, perhaps most incredibly, she believes that an email chain between Lin and Ergometrics in which they attempted to resolve the scoring issue was simply fabricated.  The only manner in which she attempts to relate her age to the test scoring issue is to conclude that she was falsely told that she did not pass the test based on her age because she

> know[s] within [her]self that [she] did pass the test.  And when Ms. Lin informed
> [her] that [she] did not past (sic) the test, then that was something that triggered
> something in [her] body saying there's something more to it than just [her] not
> getting the position.

(Doc. 28 at 126).  It hardly bears stating that this sort of testimony does not suffice to support a legal claim or to rebut a defendant's legally sufficient explanation for an act.

The County has offered legitimate, non-discriminatory reasons for its action in refusing to promote Robinson to the corrections officer position, which reasons Robinson has entirely failed to rebut.  Therefore, the County is entitled to summary judgment.

## IV.    Conclusion

Federal courts, or any other court for that matter, do not exist as fora for parties to air grievances based on differences in matters of perception, as ears for parties wishing to complain about various events or decisions with which they are not satisfied, or as sleuths itching to pursue conspiracy theories; rather, they are courts of law, in which the parties, and their respective counsel, are expected to be knowledgeable of, and willing to apply, the legal standards governing the issue at hand.  Among those standards are the requirements and restrictions of Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. section 1927.  This case causes the Court to

question whether those guidelines are emphasized and taken to heart to a sufficient degree within

the legal community.  For the reasons stated herein, it is

      **ORDERED THAT** Orange County's Motion for Summary Judgment is GRANTED.  This

case is removed from the October 2, 2006 trial calendar, and the Clerk is directed to close the file.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on June 16, 2006.

                                  **GREGORY A. PRESNELL**
                             **UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party